NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

HOWMEDICA OSTEONICS CORP., a
subsidiary of STRYKER CORPORATION,
a New Jersey corporation,

                                        Plaintiff,

v.

BRETT HOWARD, an individual, and
COREY PETULLA, an individual,

                                        Defendants.

Case No. 19-19254 (EP) (AME)

**OPINION**

**PADIN, District Judge.**

Brett Howard and Corey Petulla (collectively, "Defendants") were employed by Howmedica Osteonics Corp. ("Howmedica"). Their individual employment contracts included, *inter alia*, non-compete and non-solicitation clauses. In October 2019, Defendants abruptly resigned their employment and went to work for a direct competitor of Howmedica, Alphatec Spine, Inc. ("Alphatec"), in California. Plaintiff has brought three claims against Defendants: (1) breach of contract; (2) tortious interference with prospective economic advantage; and (3) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*. D.E. 1. Before the Court are two fully-briefed motions pursuant to Fed. R. Civ. P. 56: Defendants' summary judgment as to all three claims and Plaintiff's partial summary judgment as to the first two claims. D.E. 74; D.E. 80. The Court decides this matter on the papers pursuant to Fed. R. Civ. P. 78 and L.Civ.R.78.1(b). For the reasons stated below, Defendants' motion is DENIED, and Plaintiff's motion is DENIED in part and GRANTED in part.

## I.       BACKGROUND

Howmedica is a subsidiary of Stryker Corporation, a New Jersey Corporation with its principal place of business in New Jersey.  D.E. 19-1 "Mayor Dec." ¶ 2.  Howmedica designs, manufactures, and sells spinal implants and instruments used in spinal surgery.  D.E. 1 "Compl." ¶¶ 1, 13.  Some of Howmedica's finished spinal products were shipped to Howmedica's New Jersey facility from overseas, where they were kitted out for use in the field, including California.  *See* Mayor Dec. ¶ 3.  Some of Howmedica's leadership, administrative, and support staff, who assisted the company's sales representatives, were based in New Jersey.  *Id.*  Beginning in late 2018, Howmedica shifted to maintaining dual campuses in Allendale, New Jersey, and Leesburg, Virginia, so some of the responsibilities of Howmedica's New Jersey facility were then shared with Howmedica's Virginia facility.  Mayor Dec. ¶ 3; D.E. 82-1 at 22:19-23:23, 26:21-27:15.

Howmedica sells its products via a network of sales representatives and associate sales representatives, who build relationships with spine surgeons, showcase Howmedica's products to those surgeons, and then provide technical support and training to surgeons who decide to use Howmedica's products.  *Id.* ¶¶ 16-18.  The spinal products industry, in which Plaintiff competes, relies heavily on these relationships with surgeons.  *See Howmedica Osteonics v. Zimmer Inc.*, 461 F. App'x 192, 194 (3d Cir. 2012).

Howard was a Howmedica sales representative based in Los Angeles, California from May 2, 2016 until his resignation on October 7, 2019.  Compl. ¶ 27; D.E. 87-3 "Howard Dep." at 132:2-4.  Prior to working at Howmedica, Howard worked as a sales representative for Medtronic, another medical device company, for three years.  D.E. 11-1 "Howard Dec." at 2.  As a Howmedica sales representative, Howard sold Howmedica products to surgeons and hospitals in the Los Angeles area.  D.E. 82-2 at 60:19-25, 62:18-24.  In this role, he attended and observed spine

surgery cases, where Howmedica products were being used.  *Id.* at 68:7-69:18.  During these surgeries, Howard took notes on his personal phone based on his observations, including surgeon preferences and operation room workflow.  *Id.* at 78:22-80:16.

Petulla was a Howmedica team member and later an associate sales representative based in Los Angeles, California, from March 5, 2016 until his resignation on October 2, 2019.  Compl. ¶ 26; D.E. 78-4 "Petulla Dep" at 169.6-16.  Prior to working at Howmedica, Petulla had no experience as a medical device sales representative.  D.E. 11-2 "Petulla Dec." at 2.  In his role at Howmedica, Petulla observed spinal surgeries, where Howmedica products were used, and assisted in sales of Howmedica products to customers.  D.E. 82-4 at 22:16-19, 22:25-23:9, 25:19-26:7, 89:7-15.  During these surgeries, Petulla took notes on his personal phone based on his observations, including surgeon preferences and operation room workflow.  *Id.* at 112:4-113:5, 118:1-5, 119:23-120:3.

At the start[1] of their employment with Howmedica, both Howard and Petulla executed "Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation" agreements ("Agreements").  Compl. ¶¶ 38, 41.  By signing the Agreements, which included, *inter alia*, non-competition and non-solicitation clauses ("Disputed Restrictive Covenants"), they agreed not to solicit Howmedica customers or work for a Howmedica competitor for a specified period of time following their termination of employment with Howmedica.  *Id.*  Additionally, the Agreements contained a non-disclosure of confidential information clause and a separate clause requiring Defendants to return certain information and materials to Howmedica upon termination of their employment.  *Id.*

---

[1] And when Petulla was promoted.

The Agreements also contain a "Governing Law and Venue" clause, which provides:

> Governing Law and Venue.   Although I may work for Stryker [Howmedica's parent company] in various locations, I agree and consent that this Agreement shall be interpreted and enforced as a contract of the applicable state listed on Attachment B [New Jersey] as of my date of termination and shall be interpreted and enforced in accordance with the internal laws of that state without regard to its conflict of law rules…

D.E. 82-13 "Howard Agreement" at 25; D.E. 82-16 "Petulla Agreement" at 10.[2]

The Agreements define "Conflicting Product or Service" as:

> any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which [Defendants'] worked or about which [they were] knowledgeable during the last twenty-four (24) months of [their] employment with Stryker…

Howard Agreement at 20.

The Agreements define "Conflicting Organization" as:

> any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a Conflicting Product or Service…

*Id.*

The Agreements define "Confidential Information" as:

> know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by [Defendants] during [their] employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-

---

[2] Because the Howard Agreement and Petulla Agreement are identical, with the exception of each individual's signature, the Court will cite to the Howard Agreement when referencing contractual language.

> specific information; (c) supplier and distributor lists; (d) pricing policies,
> methods of delivering services and products, and marketing and sales plans
> or strategies; (e) products, product know-how, product technology and
> product development strategies and plans; (f) employees, personnel or
> payroll records or information; (g) forecasts, budgets and other non-public
> financial information; (h) expansion plans, management policies and other
> business strategies; (i) inventions, research, development, manufacturing,
> purchasing, finance processes, technologies, machines, computer software,
> computer hardware, automated systems, engineering, marketing,
> merchandising, and selling. Confidential Information shall not include
> information that is or becomes part of the public domain, such that it is
> readily available to the public, through no fault of [Defendants].

*Id.* at 19-20.

The Agreements define "Restricted Period" as "the twelve-month period following termination of my employment with Stryker, regardless of the reason for termination." *Id.* at 20. Petulla's restrictive period was twelve (12) months in accordance with the definition in the Agreements. On the other hand, Howard's restrictive period was eighteen (18) months pursuant to an "Extended Compensation Offer" that he signed on May 15, 2018. D.E. 87 at 5-6.

The Agreements provide a "Non-Solicitation of Customers and Supplier" clause, which provides:

> I agree that during my employment with Stryker and during the Restricted
> Period, I will not, in any capacity, directly or indirectly, personally or
> through another person, (i) solicit, contact or sell any Conflicting Product
> or Service to a Stryker Customer; (ii) solicit, contact or sell any product or
> service to a Stryker Customer that competes with or is similar to any Stryker
> product or service; (iii) divert, entice or otherwise take away from Stryker
> the business or patronage of any Stryker Customer; or (iv) solicit or induce
> any vendor, supplier or Stryker Customer to terminate or reduce its
> relationship with Stryker.

*Id.* at 23.

The Agreements contain a "Non-Compete" clause, which, in relevant part, provides:

> (a)     During my employment with Stryker and during the Restricted
> Period, I will not work (as an employee, consultant, contractor, agent, or
> otherwise) for, or render services directly or indirectly to, any Conflicting

5

Organization in which the services I may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which I have had access to during my employment.  This provision shall not bar me from accepting employment with a Conflicting Organization whose business is diversified and which is, as to that part of its business in which I accept employment, not a Conflicting Organization.  If I accept employment with a Conflicting Organization, I will provide Stryker written assurances satisfactory to Stryker that indicate that I will not render services directly or indirectly, during the Restricted Period, in connection with any Conflicting Product or Service.  I understand that Stryker may also require written assurances from the Conflicting Organization.  I also agree that during my employment with Stryker and during the Restricted Period, I will not render services to any organization or person in a position similar in responsibilities to any position I held with Stryker during the twenty-four (24) months prior to the termination of my employment with Stryker for any reason or in which I could use Confidential Information to the detriment of Stryker…

(c)    Notwithstanding [] (a), hereof, it at the time of the termination of my employment, my responsibilities include: sales or service, case coverage, servicing products or assisting with sales or service, case coverage or servicing product within a geographic area, territory, branch or assigned customer accounts, then the post-employment restrictions set forth in [] (a) hereof shall include and be limited to (i) the geographic area, territory, branch and assigned customer accounts that, directly or indirectly, was covered by me or by employees, distributors, agents or representatives who reported to me at any time during such twenty-four (24) month period preceding the termination of my employment; and/or (ii) any geographic area, territory, branch and assigned customer accounts to which I provided services, covered cases, made proposals, made sales or serviced products whether directly or indirectly, at any time during such twenty-four (24) month period preceding the termination of my employment.

*Id.* at 23.

The Agreements contain a "Non-disclosure of Confidential Information" clause, which

provides:

I recognize that Confidential Information is of great value to Stryker, that Stryker has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate irreparable injury to Stryker.  Unless I first secure Stryker's written consent, I will not disclose, use, disseminate, identify by topic or subject, lecture upon or publish Confidential Information.  I understand and

> agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

*Id.* at 22.

The Agreements contain "Return of Information and Materials" and "Return of Stryker Property" clauses, which provide:

> Upon termination of my employment with Stryker for any reason whatsoever, or at any time requested by Stryker, I will immediately return to Stryker any and all Confidential Information and any and al information and material relating to Stryker's business, products, personnel, suppliers or customers, whether or not such material is deemed to be confidential or proprietary. Thereafter, any continued possession will be deemed to be unauthorized. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of Stryker and which were entrusted to me or obtained by me at any time during my employment with Stryker…
>
> Upon termination of my employment with Stryker for any reason whatsoever, or at any time requested by Stryker, I will return to Stryker any and all property in my possession which belongs to Stryker, including the following: all keys and security and credit cards; all equipment, products, samples, inventory, tools, computers, software, cell phones and other electronic devices; all customer files, account files, price lists, product information, training manuals, promotional materials and handbooks; and all other documents relating to Stryker's business, products, personnel, suppliers, and customers.

*Id.*

Respectively, on October 2 and 7, 2019, both Petulla and Howard resigned from Howmedica without prior notice. Compl. ¶ 2. They both began working for Howmedica's competitor, Alphatec, and allegedly also began soliciting Howmedica clients on October 7, 2019. *Id.* ¶¶ 47, 49, 52, 54, 65, 72, 74; Howard Dec. ¶ 2; Petulla Dec. ¶ 2. Howard's role at Alphatec is as a regional business manager for Alphatec. Howard Dec. at 1. Petulla's role at Alphatec is as a

sales representative.  Petulla Dep. 19:12-18.  In that role, Petulla reports to Howard.  *Id.* at 19:22-24.

Plaintiff now brings three claims against Defendants: Count I – "Breach of Contract" for alleged violations of four separate clauses in the Agreements, including the Disputed Restrictive Covenants, Compl. ¶¶ 82-87; Count II – "Tortious Interference with Prospective Economic Advantage" for alleged diversions of Howmedica's business to Alphatec, *id.* ¶¶ 88-94; and Count III – "Violation of Defend Trade Secrets Act" for allegedly misappropriating Plaintiff's purported trade secrets, *id.* ¶¶ 95-104.

Before the Court now are two fully-briefed motions: Defendants motion for summary judgment with respect to all three claims, D.E. 75; and Plaintiff's motion for summary judgment with respect to the first two claims, D.E. 81.  The Court now decides both motions.

## II.    STANDARD OF REVIEW

A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment.  *See id.*

The party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 136, 145-46 (3d Cir. 2004).  The moving party must support its motion by citing to specific materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has adequately supported its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by

her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). The nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. The nonmoving party "cannot create an issue of fact merely by [] denying averments [] without producing any support evidence of the denials." *Thimons v. PNC Bank,* NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Where the nonmoving party's "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50). But "[i]f reasonable minds could differ as to the import of the evidence," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Count I – Breach of Contract

*1.    New Jersey law governs Plaintiff's contract claim*

As a threshold matter, the Court must determine what state's substantive contract law governs Plaintiff's breach of contract claim. Plaintiff maintains that New Jersey law governs

because the choice of law clause in the Agreements is valid and should be enforced.  *See* D.E. 81 "Pl.'s Mot." at 15-20.  Defendants take the position that the choice of law clause is unenforceable, because New Jersey has no significant relevance to this dispute, and all facts, circumstances, and occurrences underlying this dispute occurred in California.  *See* Defs.' Mot. at 15-24.  The Court agrees with Plaintiff.  New Jersey law governs Plaintiff's breach of contract claim.

"Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996).  Where jurisdiction depends upon diversity of citizenship, federal courts "must follow conflict of laws rules prevailing in the states in which they sit."  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941).  "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state."  *Homa v. American Express Co.*, 558 F. 3d 225, 227 (3d Cir. 1999) (citations omitted).  Here, the case is based on diversity jurisdiction, and the Court sits in New Jersey.  *See* D.E. 1-3 at 1.  Therefore, the Court applies federal procedural rules and the New Jersey choice of law rules in deciding whether the Agreements' choice of law clause is enforceable.

In New Jersey, "effect [is generally given] to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy."  *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124, 133 (N.J. 1992)).  Here, the choice of law clause in the Agreements explicitly provides that New Jersey choice of law applies to the interpretation and enforcement of the Agreements.  Howard Agreement at 25, 28.  Thus, the Court will enforce the clause so long as it does not conflict with New Jersey public policy.

In evaluating whether the clause conflicts with New Jersey public policy, courts sitting in diversity apply the Restatement (Second) of Conflict of Laws § 187(2), which states that the law of the state chosen by the parties will apply unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws § 187(2); Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 651-52 (D.N.J. 2018).

Here, Defendants challenge the enforceability of the choice of law clause by claiming that exception (b) is applicable.  They claim that California has a "materially greater interest" than New Jersey and, thus, that the Court should apply California law.  Defs.' Mot. at 16.  Plaintiffs claim that exception (b) does not apply here because New Jersey has at least as great of an interest in this case as California.  Pl.'s Mot. at 17.

For the Court to adopt Defendants' position and find that exception (b) applies, Defendants must establish: (1) California has a materially greater interest than New Jersey in the outcome of this dispute; (2) application of New Jersey law would be contrary to a fundamental public policy of California; and (3) absent a valid and enforceable choice of law clause, California law would apply.  *Divergent, LLC v. Carino*, Civ. No. 18-3155, 2018 U.S. Dist. LEXIS 56073, at *7 (D.N.J. Apr. 2, 2018).

First, the Court must determine whether California has a materially greater interest in the matter than New Jersey.  In *Chemetall US Inc. v. LaFlamme*, Civ. No. 16-780, 2016 U.S. Dist. LEXIS 29644, at *23-24 (D.N.J. Mar. 8, 2016), the Court rejected an Indiana-based defendant's

claim that a New Jersey choice of law clause in his employment contract was unenforceable because Indiana was the "center of gravity" of the employee-employer relationship.  There, the Court outlined that New Jersey had an interest in "enforcing its company's rights, in enforcing covenants that are reasonably designed to protect the legitimate interests of its residents, and in protecting the confidential information of its residents."  *Id.*; *accord Coface Collections N. Am. v. Newton*, 430 F. App'x 162, 168 (3d Cir. 2011).  With that, the Court concluded that even though Indiana had an interest in the matter, that its interest was not materially greater than New Jersey's interest.  *Chemetall*, 2016 U.S. Dist. LEXIS 29644, at *24-25.

Similarly, in *Diversant, LLC v. Carino*, Civ. No. 18-3155, 2018 U.S. Dist. LEXIS 56073, at *7-10 (D.N.J. Apr. 2, 2018), the Court rejected a California-based defendant's claim that a New Jersey choice of law clause in his employment contract was unenforceable simply because the contract was formed, signed, exclusively performed, and allegedly breached in California.  The Court acknowledged that California had a substantial interest, but found that New Jersey did, too, because the plaintiff was headquartered in New Jersey, the employment contract was negotiated, prepared, and executed in New Jersey, the plaintiff substantially performed on the contract from New Jersey, and the confidential information the defendant accessed came from a cloud storage platform maintained in New Jersey.  *Id.* at *8.  The Court concluded that the defendant had not established that California's interest was materially greater than New Jersey's interest.  *Id.* at *9-10.

Here, like in *Chemetall* and *Diversant*, New Jersey's interest is significant enough that California's interest in the matter is not materially greater.  Plaintiff puts forth the following facts

demonstrating New Jersey's interest: Howmedica is at least partially-based in New Jersey;[3] Howmedica's senior leadership team is at least partially-based in New Jersey; at least some of Howmedica's research and development, finance, and operations' employees are based in New Jersey; and at least some of Howmedica's equipment and inventory is shipped to the company's sales force from New Jersey. *See* D.E. 82 ¶¶ 7-11. These facts support the conclusion that New Jersey has a substantial interest in enforcing the rights of Howmedica, a New Jersey-based company, especially where the parties voluntarily negotiated the Agreements that explicitly designate New Jersey law to control. *See Coface N. Am.*, 430 F. App'x at 168 (finding that Delaware had a substantial interest in enforcing the voluntarily negotiated choice of law clause designating Delaware law to govern).

Defendants put forth the following facts demonstrating California's interest: Defendants lived and primarily[4] worked in California and the alleged breach of the Agreements occurred in California. *See* Defs.' Mot. at 16-17. Courts in this district have previously concluded that geographic ties without more do not create a materially greater interest than that of New Jersey's in enforcing an otherwise valid choice of law clause. *See Chemetall*, 2016 U.S. Dist. LEXIS 29644, at *21, 23, 24-25; *Diversant*, 2018 U.S. Dist. LEXIS 56073, at *9. Thus, while the facts presented by the parties support a finding that both California and New Jersey have an interest in the matter, they do not support a finding that one state has a materially greater interest than the other. *See Chemetall*, 2016 U.S. Dist. LEXIS 29644, at *25 (finding that Indiana did not have a materially greater interest than New Jersey where the defendant was a resident of and primarily

---

[3] The Court acknowledges that Howmedica does not only operate out of its New Jersey location, but also out of its Virginia location. Defendants overemphasize this fact in an attempt to diminish New Jersey's interest in this case.

[4] Defendants sometimes travelled to sales conferences outside of California as part of their employment with Howmedica.

worked in Indiana); *see also Diversant*, 2018 U.S. Dist. LEXIS 56073, at *7-8 (concluding that California did not have a materially greater interest than New Jersey based on the fact that the defendant was a resident of and exclusively performed his employment contract in California).

The Court disagrees with Defendants' position that *Cabela's LLC v. Highby*, 801 F. App'x 48 (3d Cir. 2020), poses "analogous circumstances." *See* Defs.' Mot. at 18-19. Defendants are correct that the Third Circuit, in *Cabela's*, refused to enforce the choice of law clause in the parties' agreement after finding that Nebraska had a materially greater interest than New Jersey. 801 F. App'x at 48-49. But Defendants ignore a couple of the most salient facts differentiating *Cabela's* from this case, including that there the parties' agreements were executed in Nebraska between Nebraska citizens and that the plaintiff's claims were partially based upon Nebraska law. *See id.* at 49. Here, Plaintiff is not a citizen of California nor are any claims raised based upon California law. Accordingly, the Court finds that California does not have a materially greater interest than New Jersey.

Because Defendants have not and cannot establish that California has a materially greater interest than New Jersey, the Court need not reach the second and third elements of exception (b) of the Restatement (Second) of the Conflict of Laws § 187(2). *See Diversant*, 2018 U.S. Dist. LEXIS 56073, at *10 (concluding that because the defendant failed to establish that California possessed a materially greater interest than that held by New Jersey that "the Court need not reach the second and third elements of § 187(2)(b).") (citation omitted).

Accordingly, the Court concludes that the choice of law clause in the Agreements is valid and enforceable as to Plaintiff's breach of contract claim.

2.      *The Agreements are generally enforceable*

a.      *The Disputed Restrictive Covenants are enforceable*

Next, the Court must determine whether the Disputed Restrictive Covenants in the Agreements are enforceable under New Jersey contract law.  Plaintiff claims that the Disputed Restrictive Covenants are enforceable because they satisfy New Jersey's requirements for enforcing restrictive covenants.  *See* Pl.'s Mot. at 20-24.  Defendants take the opposite position, claiming that the Disputed Restrictive Covenants are unenforceable under New Jersey law.[5]  D.E. 85 "Defs.' Opp'n" at 22-25.  The Court agrees with Plaintiff, at least with respect to the non-competition and non-solicitation clauses.

New Jersey courts have enforced reasonable restrictive covenants against post-employment competition for over one-hundred years.  *See Mandeville v. Harman*, 42 N.J. Eq. 185, 189-90, 7 A. 37 (Ch. 1886); *see also Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 61 (1970); *ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019).  To determine whether a restrictive covenant is reasonable and, thus, enforceable, the Court looks to three factors: (1) whether the restrictive covenant is "necessary to protect the employer's legitimate interests in enforcement[;]" (2) whether enforcing the restrictive covenant imposes an "undue hardship [on] the employee[;]" and (3) whether enforcing the restrictive covenant contravenes the public interest.  *See Solari*, 264 A.2d at 61; *see also Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 869 A.2d 884, 897 (N.J. 2005).  New Jersey courts also take into consideration three additional factors to

---

[5] Defendants also argue that the Disputed Restrictive Covenants are unenforceable under California law. Defs. Mot. at 15.  Because the Court has already concluded that New Jersey law applies as to the breach of contract claim, the Court will focus on whether the Disputed Restrictive Covenants are enforceable under New Jersey law only.

determine whether a restrictive covenant is overbroad: its duration; the geographic limitations; and the scope of prohibited activities. *Cmty. Hosp. Grp.*, 869 A.2d at 897.

New Jersey courts strive, "if possible, to salvage restrictive covenants, construing the [] three-part test as rarely justifying the total invalidation of a restrictive covenant." *ADP, LLC v. Pittman*, Civ. No. 19-16237, 2019 U.S. Dist. LEXIS 181274, at *29 (D.N.J. Oct. 18, 2019) (quoting *Rafferty*, 923 F.3d at 121). The first two factors require balancing the competing interests of the employer and employee. *See Newport Capital Group, LLC v. Loehwing*, Civ. No. 11-2755, 2013 U.S. Dist. LEXIS 44479, at *17 (D.N.J. Mar. 28, 2013) (citing *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879, 892-93 (1988)).

In determining an employer's legitimate interests, courts consider an employer's need to protect "trade secrets or proprietary information," "customer relationships," and any other "highly specialized, current information not generally known in the industry, created and stimulated by the [] environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment." *ADP, LLC v. Kusins*, 460 N.J. Super. 368, 215 A.3d 924, 943 (App. Div. 2019) (internal citations omitted). But those interests do not extend to "preventing competition or preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry." *Ethicon v. Randall*, Civ. No. 20-13524, 2021 U.S. Dist. LEXIS 102119, at *20 (D.N.J. May 28, 2021) (internal citations omitted).

New Jersey courts have recognized that protecting customer relationships and goodwill are legitimate business interests. *See, e.g.*, *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577, 581 (1971) ("the employer has a patently legitimate interest [] in protecting his customer relationships."). In *A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 524 A.2d 412, 416

16

(App. Div. 1987), the Appellate Division enforced a restrictive covenant protecting a management consulting firm's interest in the client relationships built and maintained by its former employee. The court reasoned that the restrictive covenant safeguarded the "significant investment of time, effort and money" that the consulting firm had exhausted in "soliciting clients and developing projects for [its] benefit." *Id.*

Here, Plaintiff asserts that it holds a legitimate business interest in preserving "customer relationships" and customer "goodwill[,]" in which it invested "significant resources in attracting and maintaining[.]"[6] *See* D.E. 86 "Pl.'s Opp'n" at 15-16. Contrary to existing case law, Defendants claim that Plaintiff merely identifies these two vague categories—customer relationships and customer goodwill—in an effort to shield itself from fair competition for independent hospitals and physicians, which are not protectable business interests. *See* Defs.' Mot. at 26-27. Defendants attempt to bolster their position by arguing that the "cultivation of relationships with spine surgeons" is not a protectable business interest. *Id.* at 27.

The Court disagrees with Defendants. As described above, customer relationships and goodwill are protectable business interests in New Jersey. *See, e.g.*, *A.T. Hudson & Co.*, 524 A.2d at 416. Like in *A.T. Hudson & Co.*, Plaintiff provided the means and resources for Defendants to develop customer relationships within their sales territory through the investment of significant resources. *See* Pl.'s Opp'n at 15-17. The Court finds that the "cultivation of relationships with spine surgeons" is exactly the type of business interest that is protectable.

---

[6] The Court notes that Plaintiff also makes a vague claim that it has a protectable business interest in the "nuances of its products [that it shared] with Defendants" consisting of "tips" and "tricks." *See* Pl.'s Opp'n at 17. The Court does not find that Plaintiff has a protectable interest in this vague third category, and, thus, will focus on the ascertainable business interests presented.

The other two factors—undue hardship and the public interest—"rarely favor the complete nullification of a restrictive covenant." *Pittman*, 2019 U.S. Dist. LEXIS at \*31.  With respect to the undue hardship factor, courts primarily consider "the likelihood of the employee finding work in his field elsewhere," *Karlin v. Weinberg*, 77 N.J. 408, 390 A.2d 1161, 1169 (1978), but significant to that consideration is the employee's own role in bringing out the hardship.  *Cmty. Hosp. Grp.*, 869 A.2d at 898 ("If the employee terminates the relationship [with his employer], the court is less likely to find undue hardship as the employee put himself [] in the position of bringing the restriction into play.").

Here, Defendants voluntarily resigned.  Additionally, as Plaintiff points out, the Disputed Restrictive Covenants explicitly permit Defendants to seek employment with a competitor, as long as they agree not to personally provide the same goods and services for the competitor during the restricted period.  *See* Pl.'s Opp'n at 19.  Both of these facts strongly disfavor a finding that the Disputed Restrictive Covenants impose an undue hardship on Defendants.

Under the public interest factor, New Jersey courts have only recognized two professions for which enforcement of a restrictive covenant runs a foul of the public interest: psychologists and attorneys.  *See Comprehensive Psychology Sys., P.C. v. Prince*, 375 N.J. Super. 273, 867 A.2d 1187, 1190 (App. Div. 2005) (finding that the uniquely personal nature of the relationship between a psychologist and his patient militate against enforcing any restrictive covenant); *Jacob v. Norris, McLaughlin & Marcus*, 128 N.J. 10, 607 A.2d 142, 151 (1992) (applying same reasoning as *Comprehensive Psychology Sys., P.C.* to attorneys); *Cmty. Hosp. Grp.*, 869 A.2d at 895 (noting that "[e]xcept for attorneys and [] psychologists, our courts have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants" (internal citations omitted)).

Here, it is clear that Defendants' relationship with surgeons is not so unique and personal as to militate against enforcement of the Disputed Restrictive Covenants.

Next, the Court considers and finds that the Disputed Restrictive Covenants are only overbroad with respect to the definition of a "Stryker customer;" thus, the Court will "blue pencil" the definition of "Stryker customer" to include only existing customers—excluding prospective customers. *See ADP, LLC v. Lynch*, Civ. No. 16-01053, 2020 U.S. Dist. LEXIS 69603, at *35 (D.N.J. Apr. 21, 2020) (narrowing the scope of the prohibited activities to only include actions taken toward existing customers and a narrow subset of prospective customers); *see also Acteon, Inc. v. Harms*, Civ. No. 20-14851, 2020 U.S. Dist. LEXIS 210932, at *9 (explaining that New Jersey courts do not hesitate to "blue pencil" a covenant but will rarely invalidate one in full) (citing *Rafferty*, 923 F.3d at 122). The Court finds that the scope is sufficiently tailored insofar as Plaintiff prohibits Defendants from competing for and soliciting Plaintiff's *existing* customers. *See Platinum Management, Inc. v. Dahms*, 285 N.J. Super. 274, 299, 666 A.2d 1028 (Super. Ct. 1995) (finding scope of restrictive covenants was not overbroad where they prevented the defendant from soliciting the plaintiff's existing customers).

With respect to the duration of the Disputed Restrictive Covenants, the Court finds it is reasonably limited: 12 months with respect to Petulla and 18 months with respect to Howard. *See 22nd Century Techs., Inc. v. iLabs*, Civ. No. 22-0717, 2022 U.S. Dist. LEXIS 48389, at *26 (D.N.J. Mar. 18, 2022) (finding that restrictive covenants of one or two years are commonly upheld) (collecting cases). Despite the reasonable duration of the Disputed Restrictive Covenants, Defendants' respective decisions to begin their employment with Howmedica's competitor less than one week after terminating their employment with Howmedica demonstrate their serious disregard for the Agreements they executed; Howard voluntarily resigned from Howmedica on

October 7, 2019 and began working for Alphatec that very same day; Petulla voluntarily resigned from Howmedica on October 2, 2019 and began working for Alphatec five days later on October 7, 2019.  *See* Howard Dec. ¶ 2; Petulla Dec. ¶ 2.

As for the geography factor, the Disputed Restrictive Covenants are geographically limited to the geographic area that Defendants serviced.  *See* Agreements § 6.3(c).

Accordingly, the Court finds that the Disputed Restrictive Covenants are enforceable.

b.      *Material issues of fact remain with respect to the remaining two disputed clauses*

With respect to the non-disclosure of confidential information clause and the clause requiring Defendants to return certain information and materials in their possession, Plaintiff has not established the existence of a protectable business interest as a matter of law.  Defendants have cast doubt as to whether information on how Howmedica gets its products to market and pricing information, product nuances, surgeon preferences and related workflow information constitute a protectable business interest.

Defendants argue that some of the categories of information that Plaintiff claims are protectable are not because Plaintiff is either too vague as to what information composes these categories or the information is simply not entitled to confidentiality.  *See* Defs.' Opp'n at 31-32. The Court agrees with Defendants that some of the categories of purportedly confidential information—"product nuances" and "pricing information"—are too vague to reasonably classify as confidential or not.  Plaintiff makes no attempt to explain why these categories of information are confidential, for example, by explaining what makes this information confidential or how disclosure to a competitor could provide a business advantage.  *See Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 226 (D.N.J. 2008) (quoting *Ingersoll-Rand Co.*, 542 A.2d at 894, "employers may have legitimate interests in protecting information that is not a trade secret or

proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the [] environment furnished by the employer.").

Plaintiff mentions one occasion where Howard may have mentioned the price of a Howmedica product in an effort to gain a competitive advantage for Alphatec by pitching a more favorable price for an Alphatec product.  But the record shows that Plaintiff did not stringently protect its own pricing information; for example, John Mayor, Howmedica's Vice President of Sales and Rule 30(b)(6) representative, testified that only *some* hospital customers enter into non-disclosure agreements with respect to Howmedica's pricing information.  D.E. 78-8 "Mayor Dep." at 81:7-23.  The Court will not infer confidentiality as to the pricing information, where Plaintiff has not clearly treated such information as confidential.

The Court also agrees with Defendants that the remaining category of purportedly confidential information—"surgeon preferences" and related "workflow"—cannot reasonably be classified as confidential at this juncture.  Defendants claim that surgeon preferences can be readily obtained either directly from or by observing surgeons and that Plaintiff does not actively preserve or require employees to provide Howmedica with this information.  For example, John Mayor testified: Howmedica can obtain information regarding surgeon preferences directly from the surgeons simply by asking; he could not think of anything specific that Howmedica does to preserve the confidentiality of this information; he did not know whether surgeons considered this information to be confidential; any individual in an operating room could observe a surgeon's preferences; and Howmedica or a sales representative could ask a nurse or hospital staff, who was in the operating room, to provide information regarding preferences.  Mayor Dep. at 78:6-80:23. The Court reserves determination as to whether the workflow notes related to the surgeon

preferences is confidential because neither party has convincingly shown that Defendants' notes are or are not confidential.

Finally, because the Court concludes that Plaintiff has not established as a matter of law that how Howmedica gets its products to market and pricing information, product nuances, surgeon preferences and related workflow information constitute a protectable business interest, it follows that Plaintiff will not be able to show that Defendants breached the clause requiring Defendants to return information and materials in their possession upon their termination from Howmedica.

3.      *Defendants breached the Disputed Restrictive Covenants*

The Court must now determine whether Defendants breached the Disputed Restrictive Covenants.   Plaintiff claims that there is no dispute that Defendants breached: (1) the non-competition clause by accepting employment with Plaintiff's competitor; and (2) the non-solicitation clause by soliciting Plaintiff's existing customers on behalf of its competitor; (3) the non-disclosure of confidential information clause by disclosing confidential information to Plaintiff's competitor; and (4) the clause requiring Defendants to return information and materials in their possession upon the termination of their employment.   Pl.'s Mot. at 25-26.   Defendants respond, respectively: (1) they were not contractually prohibited from taking a job with a competitor under California law; (2) they engaged in "preliminary steps" that do not constitute solicitation of Plaintiff's customers; (3) they did not disclose or retain confidential information because the information that Plaintiff claims is confidential is vague; and (4) the notes that Defendants retained on their phones did not contain confidential information because they simply captured information generated by hospitals and surgeon preferences was not information owned by Plaintiff.   Defs.' Opp'n at 22-25.   Because the Court found in the preceding section that there

exist material disputes as to the enforceability of the clauses referenced in (3) and (4), the Court need not address whether those two clauses were breached at this juncture.

With respect to the non-competition and non-solicitation clauses, Plaintiff has demonstrated that there is no genuine issue of material fact as to whether Defendants breached those clauses in their Agreements. Two particular facts demonstrate that Defendants breached the non-competition clause: (1) the record reflects that Howmedica and Alphatec compete for the same business, specifically marketing and selling products for use in spinal surgeries in the Los Angeles region to surgeons and hospitals, Pl.'s Mot. at 26; and (2) Defendants took on roles at Alphatec that at a minimum significantly overlap with their previous roles at Howmedica because they are involved in the sale of products used in spinal surgery. The Court finds Defendants breached the non-competition clause.

Plaintiff has also provided the Court with sufficient evidence to demonstrate that Defendants breached the non-solicitation clause. Black's Law Dictionary defines "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or a petition." *Solicitation, Black's Law Dictionary* (10th ed. 2014). Significantly, nowhere in that definition does solicitation require that the request or petition be successful.

Defendants unconvincingly argue that because they were unsuccessful in obtaining business for Alphatec from Howmedica's customers that they could not have violated the non-solicitation clause, but that argument plainly ignores the meaning of solicitation. Plaintiff provides a series of convincing examples where Defendants solicited Alphatec products to Howmedica customers. For example, Howard contacted a Veterans Affairs ("VA") hospital in West Los Angeles, a Howmedica customer that Howard worked previously worked with at Howmedica, immediately after he joined Alphatec. D.E. 85-1 at 42-43. It is unavailing that Alphatec's products

23

were not authorized for use at the VA hospital until the second/third quarter of 2020—after Howard's restrictive period had ended—because the solicitation itself occurred during the restrictive period.  *See id.*  Additionally, Howard contacted Dr. Frances Hornicek, a Howmedica customer, to solicit business for Alphatec in October 2019.  *Id.* at 46.  Again, it is unavailing that Dr. Hornicek never used Alphatec products because that does not overcome the fact that Howard solicited business from him.  *See id.*  Similarly, Petulla contacted Dr. Rojeh Melikian, a Howmedica customer that Petulla worked with while at Howmedica, to solicit business for Alphatec in October 2019 and January 2020.  *Id.* at 51-52.  Again, it is unavailing that Dr. Melikian never used Alphatec products for the same reason expressed above.  *See id.* at 52.  From these examples, it follows, Defendants breached the non-solicitation clause.

Additionally, the Court notes that Defendants' attempt to circumvent the effect of their Agreements by stating that they did not thoroughly read the Agreements before they signed them is unavailing because "signing a contract creates a conclusive presumption that the signer read, understood, and assented to its terms."  *See Raiczyk v. Ocean County Veterinary Hospital*, 377 F.3d 266, 270 (3d Cir. 2004); *Baig v. Nuclear Regul. Comm'n*, Civ. No. 10-0842, 2013 U.S. Dist. LEXIS 51545, at *10 (D.N.J. Apr. 10, 2013) (noting that *failure to read a contract is not a defense* to being bound by the terms of a contract) (emphasis added).

Accordingly, the Court finds that Defendants breached the non-competition and non-solicitation clauses in the Agreements.

4.    *Plaintiff's damages*

Finally, at the summary judgment stage, Plaintiff needs not prove the actual amount of damages in order to establish liability on a breach of contract claim.  Instead, Plaintiff only needs

to show that it sustained damages as a result of Defendants' breach.[7]  *See Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685, 688 (3d Cir. 2014).   But Plaintiff's burden is not so onerous because "the general rule is that whenever there is a breach of contract…the law ordinarily infers that damage ensued[.]"  *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 45-46, 477 A.2d 1224 (1984) (internal citations omitted); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 568-69 (D.N.J. 2003) (same).

Here, Plaintiff has established as a matter of law that Defendants breached the Disputed Restrictive Covenants.  The Court does not grant summary judgment in favor of Plaintiff with respect to the issue of damages because Plaintiff has not demonstrated with certainty its actual damages.

Accordingly, the Court finds that Plaintiff is entitled to summary judgment as to Defendants' liability with respect to their respective breaches of the Disputed Restrictive Covenants in the Agreements.[8]

**B.**      **Count II – Tortious Interference with Prospective Economic Advantage**

*1.*      *California law governs Plaintiff's tort claim[9]*

Before addressing whether Plaintiff, Defendants, or neither is entitled to summary judgment as to the claim for tortious interference with prospective economic advantage, the Court must make two preliminary determinations: (1) whether the choice of law clause in the Agreements governs Plaintiff's tort claim; and (2) if the clause does not govern, then the Court must determine

---

[7] While Defendants also move for summary judgment on the breach of contract claim, their motion is moot because the Court has found that Plaintiff established that they breached the non-compete and non-solicitation clauses.

[8] But the Court emphasizes that Plaintiff has not established actual damages, so only nominal damages are appropriate at this juncture.

[9] Choice of law analysis takes place on an issue-by-issue basis, which means that the Court must undergo a separate choice of law analysis for Plaintiff's tort claim.

which state's law does govern this claim.  The parties disagree as to whether California or New Jersey law is applicable.  *See* Pl.'s Opp'n at 26-27; Defs.' Opp'n at 35-36.  The Court agrees with Defendants.  California law governs Plaintiff's tortious interference with prospective economic advantage claim.

First, Defendants argue that the language of the choice of law clause limits its application to disputes concerning the Agreements themselves, and thus does not extend to Plaintiff's tort claim.  Defs.'s Mot. at 24.  Plaintiff does not directly respond to this argument, instead, claiming that Defendants belatedly raised the choice of law issue.  Pl.'s Opp'n at 26.  The Court finds the timing of Defendants' argument appropriate, as the Court now has the benefit of complete discovery in making its decision on this issue.

Whether the choice of law clause encompasses tort claims turns on the language of the clause itself.  In *Portillo*, the choice of law clauses in a disputed agreement provided: "This Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey, without regard to the choice-of-law rules of New Jersey or any other jurisdiction" and "This Agreement shall be governed by laws of the State of New Jersey, both as to interpretation and performance."  *Portillo*, 323 F. Supp. 3d at 648-49.  The Court reasoned that the choice of law clauses were so narrowly drafted that they only applied to disputes regarding the "interpretation" of the agreement itself.  *Id.*; *see also CDK Global, LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 301 (D.N.J. 2020) (emphasizing that the choice of law clauses in *Portillo* were so narrow that they would not even extend to all contract claims).  Similarly, in *Black Box Corp. v. Markham*, 127 F. App'x 22, 25 (3d Cir. 2005), the Third Circuit held that the following choice of law clause was narrowly drafted to only encompass the agreement

itself, "and not necessarily the entire relationship" among the parties: "This agreement will be governed by, and construed and enforced in accordance with, the laws of [Pennsylvania]."

Here, like in *Portillo* and *Black Box*, the choice of law clause in the Agreements is narrowly drafted. Specifically, the choice of law clause provides: "I agree and consent that this Agreement shall be interpreted and enforced as a contract of [New Jersey] as of my date of termination and shall be interpreted and enforced in accordance with the internal laws of [New Jersey] without regard to its conflict of law rules." Howard Agreement at 25. The language in the choice of law clause speaks only to the interpretation and enforcement of the Agreements.[10] Thus, the Court will not infer an intent by the parties that the choice of law clause encompass any non-contract claims.

Because the Court finds that the choice of law clause does not encompass Plaintiff's tort claim, it must now determine which state's law is applicable. As mentioned earlier in the Opinion, *supra* Section III.A.1., the Court must apply federal procedural rules and the New Jersey choice of law rules in determining which state's law governs here. *See Gasperini*, 518 U.S. at 427; *see also Klaxon*, 313 U.S. at 494.

To make this determination, New Jersey applies the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws. *See P.V. v. Camp Jaycee*, 197 N.J. 132, 142-43, 962 A.2d 453 (2008) (citing omitted). New Jersey's most significant relationship test requires two steps. The first step is to determine whether an actual conflict exists between the laws of the potential forums. *Maniscalco v. Brother Intern. (USA) Corp.*, 709 F.3d 202, 206 (3d Cir.

---

[10] The Court notes that there is a body of case law in the Third Circuit that has concluded that a "broad and all encompassing" choice of law clause will "encompass[] all tort claims that may arise from the [contract]." *See Sullivan v. Sovereign Bancorp Inc.*, 33 F. App'x 640, 642, (3d Cir. 2002) (unpublished); *see also Pro v. Hertz Equip. Rental Corp.*, Civ. No. 06-3830, 2008 U.S. Dist. LEXIS 100181, at *14-15 (D.N.J. Dec. 11, 2008), *amended on other grounds*, 2009 U.S. Dist. LEXIS 36061 (D.N.J. Feb. 3, 2009). But the clause at issue here is not "broad and all encompassing."

2013) (citing *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006)) (internal citation omitted). "If there is no distinction between the potentially applicable laws [New Jersey and California], there is no choice-of-law issue to be resolved and the court will apply the law of the forum state [New Jersey]." *Clark v. Prudential Ins. Co. of America*, Civ. No. 08-6197, 2009 U.S. Dist. LEXIS 84093, at *15 (D.N.J. Sept. 15, 2009) (citing *Camp Jaycee*, 197 N.J. at 143). But if an actual conflict exists, then the second step is to determine which forum has the "most significant relationship" to the claim by weighing the choice of law factors—corresponding to tort claims— outlined in the Restatement (Second) of Conflict of Laws § 145. *See id.*

The parties disagree regarding which law, New Jersey or California, governs Plaintiff's tort claim. In arguing that California has the most significant relationship to this claim, Defendants skip the first step in the most significant relationship test and immediately weigh the choice of law factors in step two. *See* D.E. 90 "Defs.' Reply" at 36 n.20. But to proceed to the second step of the test, a conflict must be found at the first step.

The Court must now determine whether a conflict truly exists. In New Jersey, to establish a claim for tortious interference with prospective economic advantage, a plaintiff must establish: (1) a reasonable expectation of advantage from a prospective contractual or economic relationship; (2) the defendant intentionally and maliciously interfered with the relationship; (3) the interference caused the loss of the expected advantage; and (4) actual damages resulted. *Am. Leistritz Extruder Corp. v. Polymer Concentrates, Inc.*, 363 F. App'x 963, 967 (3d Cir. 2010). For purposes of this tort, "malice is defined to mean the harm was inflicted intentionally and without justification or excuse." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751, 563 A.2d 31 (N.J. 1989) (citation omitted). In California, to establish the same claim, a plaintiff must demonstrate: (1) an economic relationship between the plaintiff and some third party, with the probability of

future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29, 63 P.3d 937, 950 (2003). California law also requires that the plaintiff show "that the defendant's conduct was wrongful by some legal measure [*e.g.*, common law] other than the fact of the interference itself." *Id.* at 951, 954.

The Court finds that the requirements to establish "malice" (in New Jersey) or "wrongfulness" (in California) differ under the laws of the two states. Specifically, New Jersey law requires only "the intentional doing of a wrongful act without justification or excuse[,]" *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 383 (3d Cir. 2016) (citations omitted), whereas, California law only requires an independent wrongful act, "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard[,]" *Korea Supply*, 63 P.3d at 954. Under California law, a plaintiff does not need to prove actual intent on behalf of the defendant, but only needs to show that the defendant "knew that the interference was certain or substantially certain to occur as a result of [his] action[s]." *Korea Supply*, 63 P.3d at 951. Thus, the Court must proceed to the second step in the most significant relationship test.

To determine whether New Jersey or California has the most significant relationship to Plaintiff's tort claim, the Court considers the choice of law factors elicited in Restatement (Second) Conflicts of Laws § 145: the location of the injury; the location of the conduct causing the injury; the "domicile, residence, nationality, place of incorporation, and place of business of the parties[;]" and the location "where the relationship, if any, between the parties is centered." In finding the comments to Section 145 instructive, the Third Circuit has held that "[t]he principal location of

the defendant's conduct is the contact that will usually be given the greatest weight" when interpreting tortious interference with contractual or economic relations claims. *See Integral Res. (PVT) Ltd. v. Istil Grp., Inc.*, 155 F. App'x 69, 73 (3d Cir. 2005) (quoting Restatement (Second) of Conflict of Laws, § 145, cmt. f).

Here, it is clear that California has the most significant relationship with Plaintiff's tort claim. Defendants' alleged misconduct occurred in California, not New Jersey. *See* Defs.' Opp'n at 36 n.20. Following the Third Circuit's guidance, the Court gives the greatest weight to this factor and finds that California law applies with respect to the claim for tortious interference with prospective economic advantage.

2.     *Material issues of fact remain with respect to Plaintiff's tort claim*

Now, the Court must determine whether either party is entitled to summary judgment with respect to the tortious interference with prospective economic advantage claim under California law. At the core of this claim is whether Defendants unlawfully interfered with Plaintiff's prospective economic advantage by directly competing with Howmedica, soliciting its clients, and using allegedly confidential business information to divert business from Howmedica to Alphatec. Defendants' assert that Plaintiff cannot establish three elements of the California law,[11] specifically: the "intentionally wrongful act" element, the "actual disruption" element, and the "economic harm" element. *See* Defs.' Mot. at 36-40; Defs.' Opp'n at 36. Plaintiff responds that it has established all three of those elements because Defendants used Howmedica's confidential information to disrupt the company's relationships with surgeons, which resulted in economic harm. *See* Pl.'s Opp'n at 27-28; D.E. 94 "Pl.'s Reply" at 10. The Court concludes that a genuine

---

[11] The five elements are listed in the preceding subsection of this Opinion.

dispute exists as to the "economic harm" element; therefore, neither party is entitled to summary judgment as to Plaintiff's tort claim.

The fifth element under California's tortious interference with prospective economic advantage law requires that Plaintiff suffered economic harm proximately caused by the acts of Defendants. *See Korea Supply*, 63 P.3d at 950. Plaintiff contends that it can satisfy this element using sales data following Defendants' resignations. Pl.'s Mot. at 30. Specifically, Plaintiff alleges that its sales declined substantially following Defendants' resignations and highlights that three of its surgeon customers reduced their use of Howmedica's products. *Id.* Plaintiff also points to one specific occasion where Dr. Hopkins allegedly used Alphatec products in a scheduled surgery rather than Howmedica products, despite having been scheduled to use the latter prior to a conversation with Howard. Pl.'s Reply at 10.

In response to Plaintiff's contentions, Defendants raise two convincing genuine disputes. First, with respect to Plaintiff's sales decline following Defendants' resignations, Defendants argue that Plaintiff cannot prove the decline was proximately caused by their purported tortious actions. Specifically, Defendants claim that witness testimony demonstrates that sales can decline for a myriad of reasons, including, for example, the COVID-19 pandemic—which began only months following Defendants' resignations. Defs.' Reply at 15. The Court agrees with Defendants that there is doubt as to whether Plaintiff can demonstrate that Defendants' diversion of business was the proximate cause of Plaintiff's sales decline. Additionally, the Court finds that a trier of fact could reasonably conclude that a decline in Plaintiff's sales following Defendants' resignations could have been an incidental result of all three of Howmedica's Los Angeles-based employees

resigning in October 2019,[12] which may have led customers to take their business elsewhere, rather than a proximate result of Defendants' alleged actions to divert business.

Second, with respect to Plaintiff's contention regarding Dr. Hopkins, Defendants argue that Plaintiff has not produced any evidence that Dr. Hopkins actually replaced Howmedica products with Alphatec products in the surgery at issue. *Id.* The Court agrees. Plaintiff provides no factual evidence on the record that Dr. Hopkins used Alphatec products in the surgery at issue. Instead, Plaintiff relies on smoke and mirrors to convince the Court that it should infer that conclusion because: Dr. Hopkins was scheduled to use Howmedica products in a surgery; a Howmedica employee contacted Dr. Hopkins' scheduler who allegedly told the employee that Dr. Hopkins was in a meeting with Howard and that she would only call the employee back if Dr. Hopkins decided to use Howmedica products in the scheduled surgery; the scheduler never called the employee back; and Howmedica products were ultimately not used in the scheduled surgery. *See* Pl.'s Reply at 10. While the timing of Howard's meeting with Dr. Hopkins may be suspicious, that does not demonstrate that Plaintiff's products were not used in the scheduled surgery as a proximate result of Howard's actions. The Court may have been more inclined to make that finding if Plaintiff's had demonstrated that Alphatec products were used in Dr. Hopkins' scheduled surgery. Therefore, the Court concludes that it is appropriate for a trier of fact to determine whether Plaintiff suffered economic harm as a proximate result of Defendants' actions.

Having found a genuine dispute as to the fifth element of Plaintiff's tort claim, the Court need not address the other four elements of the claim at this juncture. Accordingly, the Court

---

[12] It is undisputed that prior to Defendants' resignations, Howmedica had only three Los Angeles-based employees and all three resigned in October 2019.

denies summary judgment to both parties with respect to the tortious interference for prospective economic advantage claim.

**C.       Count III – Defend Trade Secrets Act**

Finally, the Court must address whether Defendants are entitled to summary judgment as to Plaintiff's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.[13]  To make out a claim under the DTSA, a plaintiff must establish:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5)."

*Oakwood Laby's LLC v.* Thanoo, 999 F.3d 892, 905 (3d Cir. 2021) (internal citation omitted).

Defendants argue that they are entitled to summary judgment because Plaintiff has failed to establish the first and third elements of a DTSA claim.  Defs.' Mot. at 31.  Specifically, Defendants claim that Plaintiff has failed to establish the existence of a trade secret because pricing information and surgeon preferences/workflow notes are not trade secrets.  Defs.' Mot. at 31, 35; Defs.' Reply at 9-10.  Furthermore, Defendants argue that even if these two types of information were protected trade secrets that Plaintiff has not established that Defendants misappropriated that information.  Defs.' Mot. at 31-34.  The Court denies summary judgment as to the DTSA claim on the basis that genuine issues exist as to whether Plaintiff has or has not established the existence of a trade secret.

The Court first addresses whether Defendants have demonstrated the existence of a protectable trade secret.  Courts have found that the existence of a trade secret is a question of fact,

---

[13] Plaintiff does not move for summary judgment as to this claim.

not law.  *Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011) (finding that generally "the question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'") (internal citation omitted); *Adecco USA, Inc. v. Staffworks, Inc.*, Civ. No. 20-744, 2021 U.S. Dist. LEXIS 117445, at \*40 (S.D.N.Y. June 23, 2021); *Avanti Wind Sys. v. Shattell*, Civ. No. 14-98, 2016 U.S. Dist. LEXIS 75406, at \*41 (W.D. Pa. June 9, 2016); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009).  With this as the starting point, the Court must proceed with caution.

"The essential inquiry for a trade secret is whether the information derives economic value, the information is not readily ascertainable by other means, and the holder endeavors for it to remain confidential." *Scherer Design Grp., LLC v. Schwartz*, Civ. No. 18-3540, 2018 U.S. Dist. LEXIS 125644, 2018 WL 361342, at \*4 (D.N.J. July 26, 2018).   Customer lists, pricing information, and marketing techniques may constitute a trade secret under the DTSA.  *Corporate Synergies Grp., LLC v. Andrews*, Civ. No. 18-13381, 2019 U.S. Dist. LEXIS 135293, at \*7 (D.N.J. Aug. 12, 2019) (citing *IDT Corp. v. Unlimited Recharge, Inc.*, Civ. No. 11-4992, U.S. Dist. LEXIS 130815, 2012 WL 4050298, at \*6 (D.N.J. Sept. 13, 2012); *Von Rohr Equip. Corp. v. Modern Fasteners Inc.*, Civ. No. 16-6675, 2017 WL 9690975, at \*1 (D.N.J. May 18, 2017)).   But, to constitute a *protectable* trade secret under the DTSA, a plaintiff must take "reasonable measures to keep such information safe."  18 U.S.C. § 1839(3)(A) (emphasis added); *see also Mu Sigma, Inc. v. Affine, Inc.*, Civ. No. 12-1323, 2013 U.S. Dist. LEXIS 99538, 2013 WL 3772724, at \*8 (D.N.J. July 7, 2013).

With respect to surgeon preferences/workflow notes, the crux of Defendants' argument is that because surgeons are free to disclose their preferences/workflow to anyone and anyone in the

operating room can observe the same then that information is readily ascertainable, and thus, cannot be a trade secret.  *Id.* at 31-32; *see also* Nelson Dep. 43:18-46:20, 86:1-87:2, 118:7-119:25; Mayor Dep. 78:6-22.  Plaintiff does not rebut that others in the operating room could ascertain surgeon preferences/workflow through observation, but instead explains that this information constitutes a trade secret because Defendants were only able to learn this information by repeatedly attending surgical cases where surgeons used Howmedica products.  Pl.'s Opp'n at 24-25.  At bottom, Plaintiff argues that Defendants learned and only had access to this valuable information about Plaintiff's customers because Plaintiff invested time and money in ascertaining this information through Defendants.

The Third Circuit has explained that the following factors should be considered in determining whether a purported trade secret is "generally known" or "readily ascertainable:" the extent to which the information is known outside of Plaintiff's business; the extent to which the information is known by employees and others involved in Plaintiff's business; the amount of effort or money Plaintiff has spent in developing the information; and the ease or difficulty with which the information could be acquired or legitimately duplicated by others.  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (citations omitted).  In focusing on the fact that others in the operating room (*e.g.*, nurses) could make the same observations about a surgeon's preferences/workflow, Defendants fail to provide whether that same information is "generally known" or "readily ascertainable" to others in Plaintiff's line of business and do not address Plaintiff's efforts in ascertaining that information.  *See Avanti*, 2016 U.S. Dist. LEXIS 75406, at *45 (finding that determination of whether a list containing customer data was a trade secret was a question for the trier of fact, despite the fact that some information contained in the

list may have been "freely available" because independently recreating the list would possibly require a significant amount of work by a competitor).

The Court finds that there is a genuine dispute as to whether the surgeon preferences/workflow notes constitute a trade secret because a trier of fact could reasonably conclude that this type of information is not "generally known" or "readily ascertainable" to Plaintiff's competitors.  Specifically, it seems unlikely that Plaintiff's competitors would have access to the operating rooms where Howmedica products are used.  Defendants' argument attempts to obscure that point by focusing on the fact that others (*e.g.*, nurses) in the operating room could ascertain surgeon preferences/workflow.  It follows that a reasonable trier of fact could also conclude that Plaintiff derives independent economic value from having access to surgeon preferences/workflow notes that its competitors cannot easily access.

Next, Defendants assert that Plaintiff's pricing information also does not constitute a trade secret, specifically because Plaintiff does not specify what pricing information is protectable.  Defs.' Reply at 9-10; Defs.' Mot. at 32-33.  Plaintiff responds that its product pricing information is a trade secret by emphasizing that competing products are not priced the same, even if they perform similar functions, and that sales professionals may guess as to a product's price based on his knowledge of the industry, but "such guesses are often 'way off' from the actual price."  Pl.'s Opp'n at 22-23.

Not all pricing information is a protectable trade secret.  The Third Circuit draws a distinction between pure pricing information, readily obtainable from other sources, and proprietary pricing formulae derived from a "range of data relat[ed] to materials, labor, overhead, and profit margin," which is entitled to protection as a trade secret.  *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir. 1985).  Moreover, other courts typically afford greater

protection to the compilation of pricing information (*e.g.*, aggregation and organization into spreadsheets), where the compilation of information is not readily ascertainable from publicly available sources. *See, e.g.*, *Freedom Medical Inc. v. Whitman*, 343 F. Supp. 3d 509, 518-20 (E.D. Pa. 2018) (limiting the scope of protectable pricing information by reasoning that spreadsheets containing pricing information constituted a trade secret because the spreadsheets were a "product of [the plaintiff's] proprietary financial model" and "comprehensive budgeting process").

Here, the Court is skeptical as to whether Plaintiff's pricing information is a protectable trade secret, but it finds that it cannot determine whether the information is "pure" pricing information as a matter of law. Plaintiff's argument that its competitors cannot readily ascertain the price that Howmedica's customers pay raises the possibility that Plaintiff does not use a standard price for each product or customer. *See* Pl.'s Opp'n at 23. This would mean that the information is not "pure" pricing information. The Court concludes that this is a question of fact and, thus, it would be inappropriate to decide that Plaintiff's pricing information is or is not a protectable trade secret at this juncture.

Additionally, Defendants argue that Plaintiff has not taken reasonable measures to protect its purported trade secrets, specifically: with respect to pricing information, Plaintiff does not require surgeons to sign non-disclosure agreements and only requires hospital customers to sign a non-disclosure agreement protecting pricing information "at times," Mayor Dep. 72:18-21, 81:10-19; and with respect to surgeon preferences/workflow notes, Plaintiff does not collect, compile or maintain that information at all—*e.g.*, sales representatives are not required to record surgeon preferences/workflow and Plaintiff has no policy in place requiring exiting employees to transfer such information back to the company, Nelson Dep. 119:5-120:7, Mayor Dep. 76:8-:79:20.

Plaintiff responds that it has taken several measures to protect its purported trade secrets, specifically: (1) requiring employees to sign Confidentiality, Intellectual Property, Non-Competition, and Non-Solicitation Agreements; (2) requiring prospective hospital customers to sign a non-disclosure agreement protecting pricing information; (3) maintaining an Electronic and Other Business Systems Policy prohibiting certain employee conduct, including the transfer of "non-public proprietary and/or confidential information of Stryker or a company with whom Stryker does business" without first obtaining authorization; and (4) restricting access to its computerized company information through the use of passwords and to individual employees on a "need to know" basis. *See* Pl.'s Mot. at 21-22. Based on this contradicting evidence, the Court concludes that it is inappropriate for it to decide whether Plaintiff took reasonable measures to protect its purported trade secrets. There is clearly a genuine dispute as to a question of fact. *See Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 425 (D.N.J. Jan. 26, 2016) ("Secrecy constitutes a quintessential question of fact.").

The Court notes that Defendants also argue that Plaintiff has not established that Defendants misappropriated the purported trade secrets. Given that several genuine disputes exist as to the existence of protectable trade secrets, the Court need not address whether Defendants did or did not misappropriate those purported trade secrets at this juncture.

Accordingly, Defendants are not entitled to summary judgment as to Plaintiff's claim under the DTSA.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is DENIED in whole, and Plaintiff's motion for summary judgment is DENIED with respect to Count II and

GRANTED with respect to the issue of liability in Count I.  An appropriate Order accompanies this Opinion.


Dated: October 28, 2022

_____
Hon. Evelyn Padin, U.S.D.J.